UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,                    Court File No. 14-cr-302 (DWF/LIB) (1)

                  Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Mark Anthony Thompson,

                  Defendant.

---

      This matter came before the undersigned United States Magistrate Judge upon Defendant Mark Anthony Thompson's Motion to Suppress Statements, [Docket No. 23]. This case has been referred to the undersigned Magistrate Judge for a report and recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a motions hearing on November 3, 2014, regarding Defendant's pretrial discovery motions[1] and Motion to Suppress Statements, [Docket No. 23]. The parties requested an opportunity to submit supplemental briefing which was completed and the motion to suppress taken under advisement as of November 17, 2014.

      For the reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Statements, [Docket No. 23], be **DENIED**.

## I.     BACKGROUND AND STATEMENT OF FACTS

### A.     Background

      Defendant Mark Anthony Thompson ("Defendant") is charged with one count of murder in the first degree, in violation of 18 U.S.C. §§ 1111, 1151, and 1153(a); one count of murder in the second degree, in violation of 18 U.S.C. §§ 1111, 1151, and 1153(a); one count of robbery, in violation of 18 U.S.C. §§ 1151, 1153(a), and 2111; and, one count of discharging a firearm

---

[1] The Court addressed Defendant's discovery motions by separate Order.

during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii). (Indictment, [Docket No. 15]).

**B.      Facts**[2]

The record presently before the Court indicates that, at approximately 3 p.m. on July 25, 2014, Federal Bureau of Investigation Special Agent Charles Bonser ("SA Bonser"), who was then at the FBI office in Bemidji, Minnesota, received a tip that Defendant had been spotted at the IGA store on the Red Lake Indian Reservation in a black Chevrolet Impala. At that time, a federal warrant for Defendant's arrest had previously been issued in connection with a shooting death that had occurred on July 14, 2014. SA Bonser relayed the information regarding the tip to the Red Lake Police Department. SA Bonser remained at the FBI office and continued to relay additional information about Defendant as it was received to the Red Lake Police Department.

Red Lake Police Department Criminal Investigator Kelly Brunelle ("CI Brunelle") informed Red Lake Police Department Captain Dana Lyons, Jr. ("Capt. Lyons"), about the federal warrant and about the information received indicating that Defendant had been spotted at the Red Lake IGA store in a black Impala.

Capt. Lyons went to the Red Lake IGA store to view the store's video surveillance recordings to see if he could locate Defendant. On the surveillance video, Capt. Lyons saw that a black Impala had been parked in the front the IGA store before he arrived. The surveillance video showed a person in the Impala, but the individual could not be identified from the video. However, from the surveillance video it was possible to see that the Impala's left front bumper had been damaged. Capt. Lyons put out an Attempt-To-Locate notice for the Impala and left the Red Lake IGA store.

---

[2] Except where expressly noted otherwise, the facts are derived from the testimony of Red Lake Police Department Captain Dana Lyons, Jr., and FBI Special Agent Charles Bonser at the November 3, 2014, motions hearing.

While leaving the IGA store parking lot, Capt. Lyons observed a black Impala with a damaged front bumper cross through an intersection directly in front of him. Red Lake Conservation Officer Patrick Pierre ("CO Pierre") was at that time following the Impala. Capt. Lyons turned to follow so that he was driving behind CO Pierre's vehicle. CO Pierre contacted Capt. Lyons to ask whether he should stop the Impala. As the Impala turned onto a road leading to the Red Lake Hospital, Capt. Lyons authorized CO Pierre to initiate a stop of the Impala.

The driver of the Impala, later identified as Defendant, did not immediately pull over when CO Pierre activated his vehicle's emergency lights; CO Pierre followed as the Impala instead continued on until reaching the parking lot of the Red Lake Hospital. Capt. Lyons followed the two vehicles. Once the Impala finally stopped, CO Pierre exited his vehicle and approached the Impala. By the time Capt. Lyons had also stopped and exited his vehicle, CO Pierre already had Defendant exit the Impala to stand by the Impala's rear driver's side door. Three other individuals remained seated in the Impala.

As Capt. Lyons approached Defendant and CO Pierre next to the Impala, he could see in plain view inside the car a liter bottle of hard alcohol and two containers of beer. Because it is unlawful to possess alcohol on the Red Lake Indian Reservation, Capt. Lyons, who at that time was not yet aware that Defendant was indeed the person named in the federal warrant, arrested Defendant for possessing alcohol on the reservation.

As he arrested Defendant, Capt. Lyons gave Defendant a <u>Miranda</u> warning. When Capt. Lyons asked Defendant whether he had understood those rights, Defendant did not respond. Capt. Lyons then asked Defendant his name, to which Defendant falsely answered, "Allen Smith."

At some point, SA Bonser too had received information indicating that Defendant was heading towards the Red Lake Hospital, and he had relayed the information to CI Collins,[3] who arrived at the hospital shortly after Capt. Lyons had arrested Defendant. CI Collins then identified Defendant as the Mark Anthony Thompson named in the federal arrest warrant. Capt. Lyons called Red Lake Police Department Officer Joe Heyer ("Officer Heyer") to transport Defendant to the Red Lake Jail.

While waiting for Officer Heyer, Defendant asked Capt. Lyons for a cigarette. When Capt. Lyons initially refused the request (because the Captain did not have any cigarettes), Defendant again asked, "Can I have a cigarette?  I'm going away for a long time." Capt. Lyons had hold of Defendant at that time and he could smell alcohol on Defendant's breath.  Capt. Lyons did not notice Defendant display any other obvious signs of intoxication.

Officer Heyer arrived shortly thereafter. When taking Defendant into his custody, Officer Heyer administered a field preliminary breath test ("PBT") to Defendant. (See Def.'s Ex. 1, 3). The PBT indicated that Defendant had a blood alcohol content of .075. (Id.).

Officer Heyer transported Defendant to the Red Lake Jail, where Defendant was booked into the jail at approximately 4:00 p.m. (See Id. at 2.). At the jail, Defendant was again given a Miranda warning. (Id. at 4). At approximately 4:02 p.m., Defendant signed a Miranda Rights Warning and Waiver Form indicating that he had been read and understood those rights. (Id.). The jail staff also administered a second PBT to Defendant. (See Id. at 2). That second PBT indicated that Defendant had a blood alcohol content of .175.  (Id.). The jail staff noted in their booking records that Defendant was under the influence of alcohol and had bloodshot eyes. (Id. at 2, 4).

---

[3] CI Collins's first name does not appear in the record.

SA Bonser was informed that Defendant had been arrested and taken to the Red Lake Jail. Accompanied by Bemidji Police Department Detective Dan Seaburg ("Det. Seaburg"), SA Bonser traveled from Bemidji to Red Lake to take Defendant into FBI custody pursuant to the federal arrest warrant.

SA Bonser took Defendant into FBI custody between 5:30 p.m. and 5:40 p.m. SA Bonser had opportunities to observe Defendant as the Red Lake Jail staff brought Defendant out to him in the jail's sally port and while assisting Defendant into the back seat of SA Bonser's truck. SA Bonser did not notice Defendant displaying any signs of obvious intoxication. The Red Lake Jail staff did not inform SA Bonser that they noted Defendant had been under the influence of alcohol when he was initially booked.

After SA Bonser, Det. Seaburg, and Defendant arrived back at the FBI office in Bemidji, the officers placed Defendant into an interview room.[4] Before the interview, which commenced at approximately 6:30 p.m., SA Bonser offered Defendant a soft drink, which he accepted. SA Bonser removed Defendant's handcuffs to allow him to drink the beverage, though Defendant remained otherwise secured by a belly band.

SA Bonser recorded his interview of Defendant, which he began by reading Defendant a Miranda warning. When asked, Defendant said that he understood those rights. Defendant also signed an FBI Advice of Rights form indicating that he understood the Miranda rights. To SA Bonser, Defendant appeared to understand the questions during the interview, and the Defendant asked clarifying questions when he did not. Defendant also appeared to SA Bonser to be intelligent and without any health or psychological issues that would have impaired his understanding.

---

[4] According to SA Bonser, the interview room at the FBI office in Bemidji resembles a small conference room.

In addition, the Defendant appeared to SA Bonser to have some prior understanding of the criminal justice system. SA Bonser testified that Defendant had at one point inquired about a packet that SA Bonser had with him during the interview. When informed that the packet was for taking a sample of Defendant's DNA, Defendant said he would not submit to a DNA sample until he had an attorney present. When SA Bonser attempted to clarify the scope of Defendant's reference to having an attorney present, Defendant said he would not answer any more questions until he had an attorney present.  SA Bonser then terminated the interview.

The interview lasted no more than approximately thirty-eight (38) minutes.

At the motion hearing the Government submitted an audio recording of the interview. The Court's review of the recording indicates that at times Defendant spoke slowly during the interview, occasionally slurring his words or speaking at a very low volume. (See Gov't Ex. 1 at 0:37-0:39, 1:27-1:30, 4:46-5:05, 7:35-7:45, 8:26-8:29, 10:02-10:05, 12:26-12:30, 12:40-13:17, 13:48-14:00, 14:19-14:21, 16:19-16:29, 22:21-22:39, 23:01-23:04, 24:13-24:21, 25:11-25:14, 31:16-31:19,  31:29-31:40, 32:41-32:50, 36:21-36:25). At other times, Defendant spoke clearly and at a more typically conversational volume. (See Id. at 1:31-1:40, 2:14-2:18, 2:35-2:55, 3:45-4:45, 5:10-7:30, 7:46-8:25, 8:30-10:01, 10:06-12:25, 12:31-12:39, 13:40-13:47, 14:01-14:18, 14:22-16:18, 16:30-22:20, 22:45-23:00, 23:05-24:12, 24:22-25:10, 25:15-31:15, 31:20-31:28, 31:41-32:40, 32:51-36:20, 36:26-37:30). Defendant appeared to comprehend the questions being asked throughout the interview, and he is heard to provide responsive and contextually appropriate answers. (See generally Id.).

During the interview, Defendant was evasive in response to certain questions. (See Id. at 11:40-12:10, 16:35-16:45, 33:40-33:55). In response to questions about what Defendant knew about why the FBI had been looking for him, Defendant attempted to get SA Bonser to reveal

CASE 0:14-cr-00302-MJD-LIB   Document 38   Filed 11/26/14   Page 7 of 18

what he knew before answering. (See Id. at 11:40-12:10, 16:35-16:45). When asked to identify individuals who had been present at the shooting death for which Defendant had been arrested, Defendant declined to answer indicating that he thought doing so would reveal incriminating information about others. (See Id. at 33:40-33:55).

During the interview, Defendant also said that he regularly uses marijuana, indicating that he smokes about three grams a day. (See Id., 21:27-21:35).

The tone of the interview was conversational. (See generally Id.). There were no threats made and no one involved raised their voices at any time. (See generally Id.). After the interview was terminated, SA Bonser arranged for Defendant to be temporarily detained in a local county jail facility.

Red Lake Police Department Officer Paul Smith later executed a search warrant that had been obtained for the Impala. (See Def.'s Ex. 2). Officer Smith found drug paraphernalia in the Impala, including a pipe, straw assembly, and a scale. (Id.).

Defendant was ultimately indicted with counts of murder in the first degree, murder in the second degree, robbery, and discharging a firearm during and in relation to a crime of violence. (Indictment, [Docket No. 15]). Defendant then filed the present motion to suppress statements.

## II. DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, [DOCKET NO. 23]

Defendant moves the Court for an order suppressing: (1) his statement giving a false name; (2) his statement when he requested a cigarette; and, (3) the entirety of the statement he made while being interviewed at the Bemidji FBI office. Defendant contends that none of the statements were the product of a voluntary, knowing, and intelligent waiver of his Miranda rights.

A.      **Standard of Review**

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444).

Interrogation is defined as "express questioning or its functional equivalent," which includes "words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

A defendant may waive the Miranda rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

B.      **Analysis**

**1. False Name.**

Defendant first moves to suppress the statement he made falsely identifying himself to Capt. Lyons as "Allen Smith." Defendant made the statement shortly after being arrested by Capt. Lyons and after having been given a Miranda warning. Defendant argues that he had not indicated to Capt. Lyons that he had understood his Miranda rights, and, in any event, that he was intoxicated when he offered the false name.

The Government argues that Capt. Lyons's asking Defendant his name is not subject to the <u>Miranda</u> analysis. In the alternative, the Government argues that Defendant was not so intoxicated as to render a waiver of his <u>Miranda</u> rights unknowing, unintelligent, or involuntary.

To be subject to suppression under <u>Miranda</u>, a statement made while in custody must be made in response to interrogation. <u>United States v. McGlothen</u>, 556 F.3d 698, 701 (8th Cir. 2009) (citing <u>United States v. Londondio</u>, 420 F.3d 777, 783 (8th Cir. 2005)). It is undisputed that Defendant was in custody when he provided a false name to Capt. Lyons because the Captain had arrested him for possession of alcohol, which is prohibited on the Red lake Indian Reservation. Accordingly, the threshold issue is whether by asking Defendant his name Capt. Lyons engaged in interrogation for the purposes of <u>Miranda</u>.

"It is well-settled that routine biographical data is exempted from <u>Miranda</u>'s coverage." <u>United States v. Brown</u>, 101 F.3d 1272, 1274 (8th Cir. 1996) (citing <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 601 (1990); <u>United States v. Horton</u>, 873 F.2d 180, 181 n. 2 (8th Cir. 1989); <u>United States v. McLaughlin</u>, 777 F.2d 388, 391–92 (8th Cir. 1985)). As such, law enforcement questions put to a suspect in custody that seek only basic identifying information are not considered interrogation for the purposes of <u>Miranda</u>, unless the asking officer should reasonably be aware that the information sought would be directly relevant to the offense charged. <u>Id.</u> (citing <u>Muniz</u>, 496 U.S. at 602 n.14; <u>McLaughlin</u>, 777 F.2d at 391–92).  Although often referred to as the "routine booking exception," this exemption from <u>Miranda</u> also applies to questions seeking basic identifying information that are asked before the formal booking process begins. <u>See, e.g.</u>, <u>Id.</u> (applying to "routine booking question" exception to officer asking for a suspect's name at the scene of an arrest); <u>see also</u> <u>United States v. Villa-Escamilla</u>, No. CR98-

4032-MWB, 1999 WL 33657682, at *6 (N.D. Iowa Mar. 10, 1999) (applying "routine biographical data" exception to officer asking for suspects' names at the scene of arrest).

Defendant is charged with murder, robbery, and use of a firearm during and in relation to a crime of violence. (Indictment, [Docket No. 15]). Defendant's name is not directly relevant to any of those crimes. Nor is there any indication in the record presently before the Court that Capt. Lyons had any reason to believe that asking Defendant his name would reveal information directly relevant to those crimes. As such, Capt. Lyons asking Defendant his name sought only basic identifying information and was not interrogation for the purposes of <u>Miranda</u>. Therefore, Defendant's provision of a false name in this case was not protected under <u>Miranda</u>, and the Court need not consider whether Defendant knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights with regard to the statement.

For the foregoing reasons, the Court recommends **DENYING** Defendant's Motion to Suppress Statements, [Docket No. 23], to the extent the motion pertains to Defendant providing a false name to Capt. Lyons.

### B.   Statement when asking for a Cigarette

Defendant next moves the Court to suppress his statement to Capt. Lyons of: "Can I have a cigarette? I'm going away for a long time." Defendant again contends the statement was the product of a waiver of his <u>Miranda</u> rights that was rendered invalid by his intoxication. The Government contends that the statement was made voluntarily and is not subject to <u>Miranda</u>.

As discussed above, to be subject to suppression pursuant to <u>Miranda</u>, a challenged statement must be made while in custody and in response to interrogation. <u>McGlothen</u>, 556 F.3d at 701. It is again undisputed that Defendant was in custody at the time that he made the

statement asking for a cigarette. Accordingly, the issue again before the Court is whether the statement was the product of interrogation by Capt. Lyons.

Defendant's statement was not made in response to any express questioning by Capt. Lyons. See Innis, 446 U.S. at 301 (defining interrogation as "express questioning or its functional equivalent"). Thus the issue with regard to the statement is whether any of Capt. Lyons' actions were the functional equivalent of interrogation. Functional equivalents of interrogation or express questioning include "words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. Prior to Defendant making the statement he now seeks to suppress, Capt. Lyons was maintaining physical control of Defendant while awaiting an officer to transport Defendant to the Red Lake County Jail, and Capt. Lyons simply denied Defendant's initial spontaneous request for a cigarette because Capt. Lyons did not have any since he did not smoke.

There is, quite simply, nothing in the record to support an argument that Capt. Lyons should reasonably have known that maintaining physical control of Defendant and denying Defendant's initial spontaneous request for a cigarette would elicit any further incriminating response from Defendant. Accordingly, Capt. Lyons actions were not interrogation, and the Court need not determine whether Defendant's statement that "I'm going away for a long time" was the product of a voluntary waiver of Defendant's Miranda rights. See United States v. Shannon, 06-6 (JNE-JJG), 2006 WL 1579852, at *3 (D. Minn. June 1, 2006) ("Where officers have not made any words or actions that would result in an incriminating response, and a suspect makes a spontaneous statement, then that statement does not violate the privilege against self-

incrimination."); see also McGlothen, 556 F.3d at 701 ("Voluntary statements not in response to an interrogation are admissible with or without Miranda warnings.").

For the foregoing reasons, the Court recommends **DENYING** Defendant's Motion to Suppress Statements, [Docket No. 23], to the extent the motion pertains to the statement Defendant made when asking Capt. Lyons for a cigarette.

### C.   FBI Office Interview

Finally, Defendant moves the Court to suppress the entirety of the statement he made while being interviewed by SA Bonser at the FBI office in Bemidji. Defendant again contends that the statements he made during that interview were not the product of a voluntary, knowing, or intelligent waiver of his Miranda rights, arguing that his intoxication rendered his waiver invalid. The government argues that the Court should find, under the totality of the circumstances, that Defendant voluntarily, knowingly, and intelligently waived his Miranda rights.

It is undisputed that Defendant was in custody during the interview and that SA Bonser's express questioning of Defendant constituted interrogation for the purposes of Miranda. It is also undisputed that SA Bonser read Defendant a Miranda rights warning at the beginning of the interview and, further, that Defendant indicated both verbally, as well as, in writing that he understood his Miranda rights before any of the questioning by SA Bonser. Accordingly, the issue presently before the Court is whether Defendant's waiver of his Miranda rights was valid as being voluntarily, knowingly, and intelligently made.

The validity of a Miranda waiver requires consideration of two distinct inquiries, namely whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and whether the waiver was

12

knowingly and intelligently made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

1. Voluntariness

Courts assess whether a waiver of the Miranda rights was made voluntarily by considering "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." United States v. Contreras, 372 F.3d 974, 978 (8th Cir. 2004). The United States Supreme Court has previously explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was *involuntary* and not as bearing on the separate question whether the waiver was knowing and intelligent." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C.Cir. 1991)).

In determining whether a waiver was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." United States v. Syslo, 303 F .3d 860, 866 (8th Cir. 2002). In considering the totality of the circumstances, a court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir.

2010) (internal quotation marks and citations omitted). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

Defendant focuses his argument here on his ability to resist coercive pressures. He, in essence, argues that his capacity to resist coercive pressures was reduced due to alcohol intoxication.[5] Although there is no evidence in the record regarding Defendant's exact blood alcohol content at the time of SA Bonser's interview, the evidence in the record indicates that, approximately two-and-a-half hours before the beginning of the interview, Defendant's blood alcohol level (as measured by a field sobriety test) may have been upwards of .175. In addition, the Court's review of the audio recording of the interview reveals that Defendant did display some signs of intoxication when he occasionally slurred words and possibly when his voice ranged in volume between a conversationally appropriate level and mumbling. See Dunn v. Norman, No. 4:11CV872 CDP, 2012 WL 1060128, at *6 (E.D. Mo. Mar. 29, 2012) (noting that mumbled speech is consistent with intoxication), certificate of appealability denied, (Nov. 13, 2012); see also Thompson v. King, 730 F.3d 742, 748 (8th Cir. 2013) (referring to slurred speech as a sign of intoxication). The Court concludes that Defendant was still to some unknown degree under the influence of alcohol during the interview by SA Bonser.

However, merely submitting evidence that a suspect was intoxicated is insufficient to compel a conclusion that the suspect's Miranda waiver was involuntary. See United States v.

---

[5] Defendant also asserts that he may have also been under the influence of narcotics, pointing to his own statement that he was a regular user of marijuana, claimed to have had marijuana on him during the interview, and that drug paraphernalia was later found in the Impala. Although there is a basis to conclude that Defendant may have used narcotics generally, Defendant has offered nothing to indicate that he used narcotics the day of the interview nor that he was under the influence of any narcotics during the interview. The Court would be required and could only engage in speculation to find that Defendant was under the possible influence of anything other than alcohol during the interview.

Gaddy, 532 F.3d 783, 788 (8th Cir. 2008) (holding waiver voluntary even when defendant had consumed alcohol along with pain killers, muscle relaxants, and a mixture of cocaine and marijuana several hours before the interrogation, where officers testified that defendant appeared awake and coherent); Contreras, 372 F.3d at 978 (holding waiver voluntary even when defendant had taken methamphetamine the night before and smoked marijuana the same day, where officers testified that defendant appeared to be sober and in control of his faculties at the time he consented). As the Eighth Circuit has previously explained, "[s]leeplessness, alcohol use and drug use are relevant to our analysis, but 'intoxication and fatigue do not automatically render a confession involuntary.'" Gaddy, 532 F.3d at 788 (quoting United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990)); see also Turner, 157 F.3d at 555-56 (refusing to adopt a per se rule for intoxication). "[T]he test is whether these mental impairments caused the defendant's will to be overborne." Casal, 915 F.2d at 1229.

Defendant can point to no evidence nor does he offer any argument that the officers engaged in any specific coercive tactics that caused his will to be overborne during the interview. In addition, SA Bonser's testimony and the Court's independent review of the audio recording of the interview indicate that the officers did not engage in coercive tactics. SA Bonser conducted the interview in a conversational tone, never raising his voice or making any threats or otherwise intimidating statements to Defendant. See United States v. Mims, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding Miranda waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone); see also United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant). The interview, which lasted only thirty-eight minutes, was also not coercive in its duration. See Id. (noting that interrogation lasting

more than two hours was not coercive in duration). In addition, Defendant has made no argument that anything about the environment in the interview room, which SA Bonser described as being similar to a conference room, created a coercive environment.

Finally, Defendant's refusal to answer certain of SA Bonser's questions on the basis that his answers might reveal incriminating information concerning others is strong evidence of his coherence and that his will was not overborne.  See Turner, 157 F.3d at 555 (holding Miranda waiver valid despite narcotics in the defendant's system where evidence indicated the defendant was able to refuse to answer questions).

 Based on the foregoing, the Court concludes that Defendant's waiver of his Miranda rights was voluntary.

2.  Knowing and Intelligent

Finally, the Court must consider whether Defendant's waiver of his Miranda rights was knowingly and intelligently made. Vinton, 631 F.3d at 483. Defendant again argues that his intoxication prevented him from knowingly or intelligently waiving his rights. The evidence in the record regarding Defendant's understanding of his Miranda rights and presence of mind during the interview consists of SA Bonser's testimony, the audio recording of the interview, and the FBI Advice of Rights form. SA Bonser testified that Defendant appeared intelligent throughout the interview and understood the questions being asked of him. SA Bonser also testified that he noticed no signs of mental or physical impairment in Defendant that would detract from Defendant's understanding of the interview.

The Court's independent review of the audio recording of the interview provides similar indications that Defendant appeared to fully track the conversation, understood the questions being posed to him, and provide contextually appropriate answers. Defendant even had the

16

coherence and presence of mind to refuse to answer questions he thought would incriminate others. See Turner, 157 F.3d at 555 (holding Miranda waiver knowing and intelligent despite the presence of narcotics in the defendant's system where evidence indicated the defendant was able to understand his rights and act in a manner consistent with a person attempting to avoid being caught, by giving a false name[6] and refusing to answer questions). Indeed, the record demonstrates Defendant's knowing and intelligent understanding of his rights and the circumstances under which the interview was being conducted by SA Bonser when, less than 30 minutes after being advised under Miranda, Defendant invoked his right to counsel and effectively terminated the interview.

Therefore, the Court concludes that Defendant's waiver of his Miranda rights was both knowing and voluntary.

In sum, based on the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Statements, [Docket No. 23], to the extent the motion pertains to the entirety of the statement Defendant made while being interviewed by SA Bonser at the FBI office on July 25, 2014.

## III.    CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements, [Docket No. 23], be **DENIED**.

Dated: November 26, 2014                                    **s/ Leo I. Brisbois**
                                                           Leo I. Brisbois
                                                           U.S. MAGISTRATE JUDGE

---

[6] In the instant case, even as early as his initial arrest hours before, Defendant exhibited that he understood the adverse nature of his circumstances by attempting to give a false name to Capt. Lyons.

17

**N O T I C E**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by December 10, 2014** a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections **by December 24, 2014**. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.